# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

STAR BUFFET, INC. and       *
SOUTHERN BARNS, INC.       *
           PLAINTIFFS       *
       COUNTERDEFENDANTS       *
      *       CASE NO. 4:17CV00533 SWW
V.       *
      *
TGB GLORY, LLC d/b/a BARNHILL'S       *
STEAKS and BUFFET, and STEVEN C.       *
BARNHILL       *
           DEFENDANTS       *
       COUNTERCLAIMANTS       *
      *
      *

## ORDER

Plaintiffs Star Buffet, Inc. ("Star Buffet") and Southern Barns, Inc.,[1] filed this

trademark/service mark[2] infringement action pursuant to the Lanham Act, 15 U.S.C.

§ 1116, against TGB Glory, LLC ("TGB"), doing business as Barnhill's Steaks and

Buffet, and Steven C. Barnhill ("Steven Barnhill"). Before the Court are Defendants'

first and second motions for summary judgment [ECF Nos. 17, 18, 19, 30, 31, 32],

Plaintiffs' responses in opposition [ECF Nos, 22, 23, 37, 41 (under seal)], and

---

[1] Southern Barns, Inc. is a wholly owned subsidiary of Star Buffet, Inc. *See* Am. Compl., ¶ 1.
[2] The marks at issue are technically "service marks," but the use of the term "trademark" is also appropriate. Under the Lanham Act, the term "trademark" includes any word, name, symbol, device or combination thereof used by a person in commerce to identify or distinguish goods, and the term "service mark," means any word, name, symbol, device or combination thereof used by a person to identify or distinguish services. *See* 15 U.S.C. § 1127. The Lanham Act provides that service marks are registerable in the same manner and with the same effect as are trademarks and entitled to the same protections. *See* 15 U.S.C. § 1053.

Defendants' replies [ECF Nos. 24, 42]. After careful consideration, and for reasons that follow, the motions for summary judgment are denied.

## I. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)

The non-moving party may not rest on mere allegations or denials of his pleading but must come forward with 'specific facts showing a genuine issue for trial. *Id*. at 587. "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).

## II. Background

In 1991, Defendant Steven Barnhill opened the first Barnhill's restaurant in Florida through his company, Barnhill's Country Buffet, Inc. ("BCB"). BCB used various service marks in connection with the restaurant that featured the word

"Barnhill's" as the dominate feature.  BCB's enterprise quickly grew to include seven restaurants.

In 1993, BCB granted Charles Barnhill, Steven Barnhill's father, permission to use Barnhill's service marks in connection with a restaurant in Nacogdoches, Texas, called "Barnhill's Steaks & Buffet."  From that time until the present, Charles has used Barnhill's marks at the Nacogdoches restaurant.

In 1995, Lovett's Buffet, Inc. ("Lovett's") purchased BCB, and Steven Barnhill stayed on as an employee.  After the purchase, Lovett's changed its name to Barnhill's Buffet, Inc. ("BBI") and expanded the business to include 45 restaurants, in several states, that used the Barnhill's service marks.  From 1999 through 2006, BBI obtained five federal trademark registrations for the Barnhill's name and logos ("the BBI marks").[3]

On December 2, 2007, BBI and Star Buffet Management, Inc. ("SBM"), a wholly-owned subsidiary of Star Buffet, entered an agreement whereby SBM would purchase Barnhill's restaurants from BBI.  The next day, BBI filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Middle District of Tennessee.

According to a motion filed on December 4, 2007 in the bankruptcy case, BBI was then operating 29 buffet style restaurants under the name "Barnhill's Buffet."[4]  The bankruptcy record shows that when BBI filed its Chapter 11 petition, it sought to sell substantially all of the company's assets and originally planned to sell 21 restaurants to

---

[3] ECF 18-14 (United States Patent and Trademark Office electronic search printouts).
[4] *See In re: Barnhill's Buffet, Inc.*, No. 3:07BK08948 (Bank. M.D. Tenn. February 28, 2008), ECF No. 9.

SBM.[5]  However, BBI and SBM entered an amended purchase agreement stating that SBM would purchase only sixteen BBI restaurants for $5 million. The bankruptcy court approved the amended agreement and sale on January 31, 2008.

On February 4, 2008, BBI sought permission to sell four of its remaining restaurants to Starlite Holdings, Inc., another wholly-owned Star Buffet subsidiary, for the sum of $1 million.[6]  The bankruptcy court initially denied the proposed sale but eventually found that it met the requirements of 11 U.S.C. § 363(b)(1) and granted approval.[7]

The approved asset purchase agreements by which Star Buffet's wholly-owned subsidiaries purchased a total 20 restaurants from BBI contained the following provision:

> **Perpetual License of Trade names**.  At the Closing but effective as of the Effective Time, Seller shall grant to Buyer a perpetual license to use any trade names, trademarked names, or graphics owned by Seller for purposes of operating the Restaurants (the "License").[8]

There is no indication in the record that the seller retained any right to control the licensee or that the buyer had exclusive rights to use the marks.

On April 28, 2008, BBI voluntarily converted the Chapter 11 proceeding to Chapter 7.[9]  On January 5, 2010, for consideration of $2,000, the Chapter 7 bankruptcy trustee transferred to Steven Barnhill "all of the bankruptcy estate's rights and interests in the Barnhill's trademark, name and logos including associated trademarks under which

---

[5] *Id*., ECF No. 307, at 2 (February 28, 2008 Order Approving Sale).
[6] *Id*., ECF No. 307, at 3.
[7] *Id*., ECF No. 307.
[8] ECF No. 10-1, at 25, ECF No. 10-2, at 4.
[9] *In re:Barnhill's Buffet, Inc*., No. 3:07BK08948 (Bank. M.D. Tenn April 28, 2008), ECF No. 441.

the debtor operated its restaurant businesses."[10]  Plaintiffs  filed no objection to this sale.

The bill of sale provided that the assets were conveyed "'as is, where is' without any

express or implied warranties . . . ."[11]  When Steven Barnhill made this purchase, two of

the five BBI marks had been cancelled for non-use, and by September 20, 2013, they had

all been cancelled.[12]

On April 21, 2014, Star Buffet's wholly-owned subsidiary, CC Starts, Inc. ("CC

Starts"), submitted an application in the United States Patent and Trademark Office

("PTO") to register the service mark BARNHILL'S SALADS BUFFET DESSERTS.  On

December 9, 2014, the mark was registered as United States Trademark Registration No.

4,652,229, and on August 8, 2017, CC Starts assigned the registration to Star Buffet.

Star Buffet has continuously used the BARNHILL'S SALADS BUFFET

DESSERTS mark on signs, menus, and other materials at the Barnhill's Country Buffet

in Jonesboro, Arkansas, one of the restaurants it purchased from BBI in 2008.

Defendants Steven Barnhill and TGB operate Barnhill's Steaks Buffet, a restaurant

located in Jacksonville, Arkansas that opened for business in 2017.  Defendants promote

their Jacksonville restaurant with the service mark BARNHILL'S STEAKS BUFFET,

which Plaintiffs contend is confusingly like BARNHILL'S SALADS BUFFET

DESSERTS.  After making unsuccessful demands that Defendants cease alleged

trademark infringement, Plaintiffs commenced this action charging willful infringement

---

[10] ECF No. 10-11.

[11] *Id.*

[12] ECF No. 18-14.  Section 8 of the Lanham Act provides that a trademark registration shall be cancelled unless at time periods specified in the statute, the owner of the registration files an affidavit regarding the mark's use. *See* 15 U.S.C. § 1058(a).

of a trademark, trademark infringement and false designation of origin, and unfair competition.

Defendants counterclaimed, seeking (1) a declaration that Defendants do not violate Plaintiffs' rights by using the service mark BARNHILL'S STEAKS BUFFET service mark and (2) cancellation of Star Buffet's trademark registration for BARNHILL'S SALADS BUFFET DESSERTS. Defendants assert that pursuant to the 2008 asset purchase agreements, Star Buffet acquired only a license to use the BBI Barnhill's service marks and that BBI retained ownership of the marks. Defendants further assert that pursuant to the bill of sale entered in BBI's Chapter 7 proceeding on January 7, 2010, Defendant Steven Barnhill is the owner of the mark BARNHILL'S SALADS BUFFET DESSERTS. In answer to the counterclaim, Plaintiffs assert, among other things, Defendants' abandonment of all rights in any mark relevant to this case.

### III. Defendants' First Motion for Summary Judgment

Defendants move for summary judgment, claiming they have superior rights in the mark BARNHILL'S SALADS BUFFET DESSERTS based on prior use. Specifically, Defendants argue that (1) Star Buffet used the BBI marks in the capacity of a licensee and such use inured to the benefit of the licensor, BBI, and then to Steven Barnhill after he purchased the BBI marks from the bankruptcy trustee, (2) Star Buffet, as a licensee, is estopped from making any adverse claims against Defendants, (3) the continued use of Barnhill's marks by Steven Barnhill's father, Charles Barnhill, inured to the benefit of Steven Barnhill, and (4) Star Buffet's PTO registration for the BARNHILL'S SALADS BUFFET DESSERTS marks should be cancelled.

The Court finds that this motion must be denied because there are material questions of fact. First and foremost is the question whether the Defendants lost priority in their marks when their registrations were cancelled or when defendants failed to use them following the purchase agreements approved by the bankruptcy court. The Lanham Act provides that a mark shall be deemed to be "abandoned" if either of the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C.A. § 1127.

A party claiming abandonment under § 1127(1),[13] formerly § 1127(a), must prove (1) discontinued use and (2) intent not to resume use, which may be inferred from the circumstances. *Id.*; *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 983-84 (8th Cir. 1983). Proof of nonuse for three consecutive years creates a rebuttable presumption of abandonment, which shifts the burden of production to the mark owner to

---

[13]Subsection 1127(2), formerly § 1127(b), delineates unintentional abandonment, including but not limited to abandonment due to "naked" or "uncontrolled" licensing. *Heaton Distributing Co. v. Union Tank Car Co.*, 387 F.2d 477, 484 (8th Cir.1967). "The generally accepted meaning of 'uncontrolled licensing' is where a trademark owner has licensed someone else to make or manufacture its products and then fails to control the quality of the products made by the licensee, thus permitting a deception of the public." *Heaton*, 387 F.2d at 485(citing Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2nd Cir. 1959)).

show use within the relevant period or an intent to resume use. *See Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1176 (11th Cir. 2002)(surveying cases regarding the effect of the three-year presumption).

Plaintiffs point to the following statement by the bankruptcy trustee appointed in BBI's Chapter 7 case: "Following the closing of the sale . . . on February 29, 2008, the Debtor was no longer operating any restaurants."[14] Plaintiffs also note that in December 2009, when the Chapter 7 trustee was administering the bankruptcy estate, the PTO began cancelling BBI's trademark registrations for failure to file affidavits of continued use.[15] The record is void of any information indicating that the bankruptcy trustee took any action with respect to perpetual licenses that BBI granted in connection with the sale of restaurants. After Stephen Barnhill purchased the bankruptcy estate's rights in Barnhill's marks, "as is," the PTO cancelled the remaining BBI registrations,[16] and Barnhill's own testimony indicates that he did not use the BBI marks from 2011 until January 2017, when he opened the Jacksonville Barnhill's restaurant.

Plaintiffs contend that the bankruptcy trustee abandoned the BBI marks and that Stephen Barnhill's nonuse of the marks between 2011 and 2017 creates a rebuttable presumption that he abandoned the marks before Star Buffet's 2014 trademark registration. Defendants counter that the "bankruptcy trustee entered into perpetual licenses with Plaintiffs' related companies[,]" and "the licensee's use inures to the benefit

---

[14] ECF No. 22-1, at 25.
[15] ECF No. 18-14, at 5-10 (Reg. Nos. 2715683, 1275386 cancelled December 19, 2009).
[16] ECF No. 18-14, at 1-2 (Reg. No. 2734399 cancelled February 13, 2010), 3 (Reg. No. 235514 cancelled January 7, 2011), 9-10 (Reg. No. 3208292 cancelled September 20, 2013). When CC

of the trademark owner."[17]  Contrary to Defendant's account of events, the record shows that BBI as a debtor in possession, not the Chapter 7 bankruptcy trustee, entered agreements with Star Buffet's subsidiaries.

Defendants claim that Charles Barnhill's use of the marks shows that they never abandoned their use, but the record is unclear concerning the nature of Charles's license and how the operation of his business in Texas was sufficient to overcome Defendants' non-use of the marks, registrations for which were all cancelled prior to the time Plaintiffs registered their marks in 2014.   "A trademark owner may grant a license and remain protected, provided [that] quality control of the goods and services sold under the trademark by the licensee is maintained." *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992).  However, "uncontrolled" or "naked"  licensing, which occurs when an owner licenses a mark and fails to control the type or quality of the licensee's goods or services, may result in abandonment of the mark.[18]  *See Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 485 (8th Cir. 1967)(quoting 15 U.S.C. § 1127).

A related question of fact is whether the bankruptcy trustee's sale of the marks to Steven Barnhill in 2010 was a transfer in gross.  Plaintiffs contend that the bankruptcy trustee conveyed Barnhill's marks to Steven Barnhill in the abstract, without an association to assets used to generate goodwill.  The Lanham Act provides that a registered mark shall be assignable with the goodwill of the business in which the mark is

---

[17]ECF No. 24, at 2.

[18]"Naked" licensing is the second form of abandonment referenced in the Lanham Act, which states that a trademark shall be deemed abandoned "[w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark."  15 U.S.C. § 1127(2).

used.  *See* 15 U.S.C. § 1060(a)(1).  This requirement recognizes that "[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed."  *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S. Ct. 48, 50–51 (1918); *see also Mid-List Press v. Nora*, 374 F.3d 690, 693 (8th Cir. 2004)(noting that property in a trade name exists only when associated with an ongoing business).  The transfer of a trademark without its associated goodwill is an "assignment in gross" that gives the assignee no rights in the mark.  *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 288 (8th Cir. 1969).[19]

If the finder of fact should determine that Defendants did not lose rights to the marks, Defendants contend that Plaintiffs, as licensees, are estopped from asserting that their rights in the marks have priority over the Defendants' rights.  Under Eighth Circuit precedent, the existence of a present and valid licensing agreement makes operative that "'long settled principle of law that a licensee of a trademark . . . may not set up any adverse claim in it as against its licensor.'" *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279–80 (8th Cir. 1977)(quoting *Pacific Supply Cooperative v. Farmers Union Central Exchange*, 318 F.2d 894, 908-9 (9th Cir. 1963)); *see also John C. Flood of Virginia, Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1111 (D.C. Cir. 2011).  *Plaintiffs might be estopped as well from claiming that the Defendants lost their rights by failing to control the licensee during the term of the license. See Seven-Up Bottling Co.*, 561 F.2d 1275, 1279–80 (8th Cir. 1977)("The establishment of an existing licensor-licensee

---

[19] Requiring the transfer of goodwill protects against consumer deception because "any assignment of trademark and its good will . . . requires the mark itself be used by the assignee on a product having substantially the same characteristics." *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 288 (8th Cir. 1969).

relationship . . . effectively constitutes an insuperable bar to recovery . . . with regard to its trademark claims.").

Defendants' counterclaim for cancellation of Star Buffet's registration mark will fail if the finder of fact determines that Defendants have lost their claim that their marks have priority. The issues concerning whether the Plaintiffs' registration is void, including whether CC Starts was an improper registrant, and whether the registration was obtained by fraud, present questions of fact that remain outstanding.

## IV. Defendants' Second Motion for Summary Judgment

With Defendants' second motion for summary judgment, they assert that Plaintiffs have no evidence to establish a likelihood of confusion, entitlement to injunctive relief, or damages. Defendants also contend that they are entitled to attorney's fees. Plaintiffs respond that (1) Defendants have made a binding judicial admission that there is a likelihood of confusion between Defendants' accused mark and Star Buffet's registered mark, (2) genuine issues of fact preclude summary judgment as to likelihood of confusion and entitlement to monetary relief, and (3) Defendants' requires for attorney's fees, prior to the entry of judgment, is premature.

### A. Likelihood of Confusion

The Court first considers Plaintiffs' argument that Defendants have made a binding, judicial admission regarding likelihood of confusion. "A judicial admission is a formal admission before a court that "acts as a substitute for evidence in that it does away with the need for evidence [as to] the subject matter of the judicial admission." *Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 978 (8th Cir. 2016)(citing *State Farm Mut.*

*Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968)). Plaintiffs correctly note that Defendants seek cancellation of Star Buffet's registration under alternative theories, including prior use, which requires proof of a likelihood of confusion. *See* 15 U.S.C. § 1052(d). However, the Court finds no allegation, stipulation or admission by Defendants that specifically admits likelihood of confusion. Defendants' assertion of prior use, without more, does not amount to a formal admission regarding a likelihood of confusion. [20]

The crucial question at this point is whether genuine issues exist for trial. To succeed with claims for trademark infringement, false designation of origin, and unfair competition, Plaintiffs must demonstrate that a likelihood of confusion exists as result of Defendants' use of the accused mark. To determine the likelihood of confusion, six factors are relevant: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) incidents of actual confusion; and (6) whether the kind of product, its cost, and the conditions of purchase can eliminate the likelihood of confusion that would otherwise exist. *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1089 (8th Cir. 1980). The Eighth Circuit has explained: "These factors do not operate in a mathematically precise formula; rather, we use them at

---

[20]Although it is not clear, Defendants appear to argue that a likelihood of confusion is not an element of their claim for cancellation based on prior use because they are asserting priority in the same mark claimed by Star Buffet. Although Star Buffet uses its mark in connection with a farmhouse logo, the service mark as registered consists only of the words "BARNHILL'S SALADS BUFFET DESSERTS." Defendants' claim priority as to the BBI marks, which are similar but not identical to Star Buffet's registered word mark.

the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005)(quoting *Duluth News–Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1096 (8th Cir.1996)). "Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding." *Id.*

 *Strength.* A trademark is measured in terms of both conceptual and commercial strength. Conceptual strength is measured according to increasing levels of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 448 (8th Cir. 2018). Generic marks, which refer to the common name of a product, are not entitled to protection, and descriptive marks are only entitled to protection if they have acquired a secondary meaning. *Id.* at 448-449. Suggestive, arbitrary, and fanciful marks, however, garner protection regardless of whether they have acquired secondary meaning. *Id.*

 Defendants argue that the service mark BARNHILL'S SALADS BUFFET DESSERTS is primarily a surname and conceptually weak. However, as depicted below, Star Buffet displays the words BARNHILL'S SALADS BUFFET DESSERTS with a logo that features a farmhouse barn and a rooster.



Considering the service mark as actually used, the word Barnhill's arguably denotes a farmhouse barn rather than a surname and suggests the qualities or characteristics of Plaintiffs' country buffet restaurant. The Court finds that where the mark falls on the distinctiveness spectrum is a question of fact for trial. *See Anheuser–Busch Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 635 (8th Cir.1984)("These categories are like colors in a spectrum, and tend to blur at the edges and merge together. . . . The correct categorization . . . is a question of fact.").

As for commercial strength, Star Buffet presents evidence of significant advertising expenditures and revenue for the Jonesboro Barnhill's restaurant from 2009 through 2018. Defendants correctly note that Star Buffet offers no evidence showing a direct link between advertising expenditures and public recognition of the Barnhill's mark. Although the record is sparse on the question of commercial strength, the likelihood of confusion "does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances, there is a likelihood of confusion." *SquirtCo v. The Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980)(citation omitted).

*Similarity*.  Plaintiffs offer the following comparison of the parties' marks:




Star Buffet's Use                    Defendant's Use

Defendants acknowledge that the marks are similar, but they argue that this fact cannot benefit Star Buffet because "it would reward Plaintiffs' wrongful conduct."[21] Defendants' argument presumes that they have priority based on prior use and deviates from the question before the Court.   The undisputed evidence shows that the parties' marks are nearly identical, and given that the parties use the marks in the same state to provide the same class of services, the similarity factor tips in Plaintiffs' favor. *See Community of Christ Copyright Corp. v. Devon Park Restoration*, 683 F. Supp. 2d 1006, 1014 (W.D. Mo. 2010), *aff'd sub nom. Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005 (8th Cir. 2011)(citations omitted)("Numerous courts have concluded that "when identical marks are used in the same geographic area for the same class of goods or services, likelihood of confusion is presumed.")

---

[21] ECF No. 42, at 4.

*Competitive Proximity.*  Star Buffet presents evidence that the parties use nearly-identical Barnhill's marks in connection with their respective all-you-can-eat, buffet restaurants that both offer country-style fare for under $10.

Relief from trademark infringement is available in the absence of direct competition.  "Confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement. Whether or not direct competition exists is but one of the elements to be considered in determining whether there is or will be a likelihood of confusion." *Cont'l Motors Corp. v. Cont'l Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967).  Furthermore, "[w]here products are related, . . . it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005)(citation omitted).

Plaintiffs assert that given the high degree of similarity between the Jonesboro and Jacksonville restaurants, "[a] customer who has patronized Plaintiffs' buffet restaurant in Jonesboro, Arkansas would almost certainly be confused when it came upon Defendants' restaurant less than two hours away in the Little Rock suburb of Jacksonville."[22] Defendants contend that the parties operate restaurants in "geographically isolated" markets, and they point out that Star Buffet offers no evidence as to whether or how often consumers encounter both restaurants.   The effect of the geographic separation between Jacksonville and Jonesboro is relevant, and Plaintiffs shoulder the burden to show that

---

[22] ECF No. 37, at 18.

despite the 115-mile distance between restaurants, consumers are likely to be confused. *See Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 69 (2d Cir. 2004)(affirming denial of preliminary relief where plaintiff's famous "Brennan's" restaurant in New Orleans and defendant's "Terrence Brennan's" restaurant in New York City were geographically disparate). However, it remains a question for trial whether the restaurants operate in geographically separate markets.

*Alleged Infringer's Intent.* The fourth factor asks whether the alleged infringer intended to pass off its goods as the trademark owner's goods. *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005). Proof of intent is not required for success in a trademark infringement or unfair competition claim, but if present, it creates an inference of likelihood of confusion. *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

Plaintiffs argue that Defendants set out to copy Star Buffet's Jonesboro restaurant when they opened their Jacksonville restaurant in 2017. It is undisputed that before Stephen Barnhill opened the Jacksonville restaurant, he was well familiar with the Jonesboro restaurant. By affidavit, Barnhill acknowledges that when he worked for Lovetts, which became BBI, he was personally involved in converting the Jonesboro restaurant into a Barnhill's restaurant. Additionally, Star Buffet presents evidence that Defendants copied Star Buffet's mark and "even the look and feel of Plaintiff's restaurant."[23] While an intent to copy is not the same as an intent to confuse, given the

---

[23] ECF No. 37, at 19.

stark similarities between the restaurants and viewing the evidence in a light most favorable to Star Buffet, the Court finds questions for trial as to whether Defendants intended to have consumers associate their restaurant with Plaintiffs'.

*Actual Confusion.*  Like intent to confuse, actual confusion is not essential to a finding of trademark infringement, but it is positive proof of a likelihood of confusion. *SquirtCo.,* 628 F.2d at 1091.  Star Buffet seeks to prove actual confusion with a copy of attorney's demand letter regarding an incident that occurred at Defendants' Jacksonville restaurant.  The attorney apparently mailed the letter to Co-Plaintiff Southern Barns, Inc., Star Buffet's wholly-owned subsidiary.  Star Buffet asserts that the misdirected letter is evidence of actual confusion.  Because the letter is unauthenticated,[24] the Court declines to assess whether it qualifies as proof of actual confusion.

*Product Type.*  The sixth factor asks whether the type of product, the price, and the conditions of purchase are such that the degree of care exercised by consumers can eliminate the likelihood of confusion that would otherwise exist. *SquirtCo.,* 628 F.2d at 1091; *see also Frosty Treats,* 426 F.3d at 1010(noting that the sixth factor "is more important in confusion-of-source cases where the degree of care that the purchaser exercises in purchasing a product can eliminate the confusion, that might otherwise exist.")  "'In considering this factor, we must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *Sensient Techs. Corp. v.*

---

[24] Exhibits in support of or in response to a summary judgment motion must be properly authenticated or verified by affidavit. *See Country Club Estates, L.L.C. v. Town of Loma Linda,* 213 F.3d 1001, 1006 (8th Cir.2000) (unverified and unauthenticated letter was a "legal nullity.").

*SensoryEffects Flavor Co.*, 613 F.3d 754, 769 (8th Cir. 2010)(quoting *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999)).

Here, the parties offer moderately-priced food at buffet-style restaurants—the type of product or service associated with a relatively low degree of consumer care in purchase decisions. This factor weighs in Plaintiffs' favor.

Based on the foregoing analysis of relevant factors, the Court finds that the likelihood of confusion remains a genuine issue of fact.

## B. Injunctive Relief

Defendants argue that because Plaintiffs have no "market penetration in Defendants' market," Plaintiffs cannot obtain an injunction enjoining Defendants from using a Barnhill's mark. The Eighth Circuit has held that "to enjoin a geographically remote infringer, the registered owner must prove that its trademarked products and the infringing products are being sold in the same geographic area, or that or that the owner has concrete plans to expand into the infringer's trade area." *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.,* 41 F.3d 1242, 1246 (8th Cir.1994). For reasons previously stated, it remains a question for trial whether the parties operate in distinctly separate geographic markets.

## C. Monetary Relief

Injunctive relief is generally the preferred remedy to resolve a trademark dispute, but the Lanham Act also permits an accounting of profits as a remedy for unfair infringement. *See Masters v. UHS of Del., Inc.,* 631 F.3d 464, 471 (8th Cir. 2011). "A circuit split exists concerning whether a Lanham Act plaintiff must prove willful

infringement, rather than mere infringement, to be eligible for monetary damages under 15 U.S.C. § 1125(a)[,]" *id*. at 472, and the Eighth Circuit has "assume[d] without deciding, that willful infringement is a prerequisite of monetary relief "for trademark infringement under 15 U.S.C. § 1117(a). *Id*. at 472 n.2. Willful infringement may be found with evidence that raises a reasonable inference that the defendant knowingly infringed the mark in question. *Id*. at 471-72.

Defendants assert that Plaintiffs are unable to show willfulness because Steven Barnhill purchased the Barnhill's marks from a bankruptcy trustee, which they contend makes it "impossible for Plaintiffs to prove willful infringement when Defendants obtained permission to use the Barnhill's marks from another federal court."[25] Assuming that a showing of willfulness is required to recover monetary relief under the Lanham Act, the Court disagrees that Stephen Barnhill's purchase of service marks on an "as is" basis precludes a finding that he knowingly infringed Star Buffet's registered mark. The Court finds that questions of fact preclude summary judgment on this issue.

### D. Attorney Fees

Defendants charge that Plaintiffs' behavior in this case warrants that the Court award Defendants attorney's fees and costs. Defendants' prejudgment request for attorney's fees is denied as premature. *See* Fed. R. Civ. P. 54(d)(2)(B).

---

[25] ECF No. 31, at 10.

## V.  Conclusion

For the reasons stated, Defendants' motions for summary judgment [ECF Nos. 17 & 30] are DENIED.

IT IS SO ORDERED THIS 29th DAY OF MARCH, 2019

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE